J-A18042-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: ADOPTION OF: R.J., AKA, R.R.M., A MINOR CHILD | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: C.J., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 291 WDA 2021 |

Appeal from the Order Entered February 3, 2021
In the Court of Common Pleas of Washington County Orphans' Court at
No(s): 63-20-0146

BEFORE: OLSON, J., NICHOLS, J., and MUSMANNO, J.

MEMORANDUM BY MUSMANNO, J.:                **FILED: NOVEMBER 19, 2021**

C.J. ("Father") appeals from the Order granting the Petition filed by Washington County Children and Youth Services ("CYS" or "the Agency"), and terminating his parental rights to R.J., a/k/a R.R.M. (a female born in March 2018) ("Child"), pursuant to 23 Pa.C.S.A. § 2511(a)(1) and (b).[1]  We affirm.

On June 5, 2018, following a shelter hearing, Child was placed in kinship care with her maternal grandmother ("Grandmother"), based upon a lack of care and supervision.  On September 4, 2018, the trial court adjudicated Child dependent.  At the time of the adjudication of dependence, Father was on

---

[1] By Order dated November 19, 2020, biological mother's parental rights were terminated involuntarily.  Mother is not a party to the instant appeal.

state parole.[2] Father's state parole required him to engage in sex offender treatment. That treatment required Father to participate in a polygraph test and an Abel assessment.[3] Further, Father was prohibited from having contact with children.

On September 26, 2018, the trial court granted CYS's Motion for Aggravated Circumstances against Father, based upon a prior termination of his parental rights as to another child. However, the trial court did not relieve CYS of its obligation to reunify Child with Father. Father was ordered to engage in reunification services, including a drug and alcohol evaluation, and directed to comply with all recommendations. Father further was directed to complete random drug and alcohol screenings, complete sex offender treatment through an appropriate provider, meet with CYS at least once every 30 days, make available certain records requested by CYS, and complete parenting education.

At a July 17, 2019, hearing, the trial court found that Father was unsuccessfully discharged from parenting classes with Project Star, a parenting education provider, because of a May 17, 2019, positive test result for alcohol.

---

[2] Father has a criminal history that includes convictions for drug offenses and corruption of minors.

[3] The Abel Assessment for Sexual Interest is an assessment used to measure a person's sexual interests toward various stimuli, including children.

On July 17, 2019, Father informed the trial court that he could not complete the polygraph test and Abel assessment required by FAACT, Inc. ("FAACT"), a sex offender treatment program, because of financial constraints. In response, the trial court informed Father that it would consider any motion for financial assistance filed by Father. However, Father did not file a motion requesting financial assistance for the polygraph test and Abel assessment. At a review hearing on January 8, 2020, the trial court determined that Father was in prison at State Correctional Institution-Fayette based upon a failure to comply with the conditions of his parole.[4]

Throughout Child's dependency, Child remained in the care of Grandmother. In the six months preceding the filing of the termination Petition, Grandmother provided all care for Child. On February 4, 2020, the Agency filed its Petition to involuntarily terminate the parental rights of Father.

The trial court conducted a hearing on CYS's termination Petition on December 18, 2020, and December 19, 2020.[5] On February 3, 2021, the trial court entered a Decree granting CYS's Petition, and terminating Father's parental rights to Child. Decree, 2/3/21. Thereafter, Father filed the instant

---

[4] As part of his parole, Father was required to participate in a relapse prevention program. However, Father failed to attend the program.

[5] Child, who was almost three years old at the time of the hearing, was represented by Guardian *Ad Litem* Megan Patrick, Esquire.

timely Notice of Appeal and a contemporaneous Pa.R.A.P. 1925(a)(2)(i) and

(b) Concise Statement of Matters complained of on appeal.

Father presents the following claims for our review:

1. Whether the [t]rial court abused its discretion and/or committed an error of law in terminating [Father's] parental rights[?]

2. Whether there was clear and convincing evidence that [Father] relinquished [his] parental claim or refused or failed to perform parental duties for at least six months prior to the filing of the [P]etition[?]

3. Whether there was clear and convincing evidence that [Child] is without essential parental care, control[,] or subsistence necessary for the physical or mental well-being of [Child,] and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by [Father?]

4. Whether the [t]rial [c]ourt abused its discretion and/or committed an error of law in terminating [Father's] parental rights pursuant to 23 Pa.C.S.A. § 2511(b)[?]

Father's Brief at 3 (footnotes omitted).

In reviewing an appeal from a decree terminating parental rights, we

adhere to the following standard:

[A]ppellate courts must apply an abuse of discretion standard when considering a trial court's determination of a petition for termination of parental rights. As in dependency cases, our standard of review requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. ***In re: R.J.T.***, [] 9 A.3d 1179, 1190 (Pa. 2010). If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. ***Id.***; ***R.I.S.***, [36 A.3d 567, 572 (Pa. 2011) (plurality opinion)]. As has been often stated, an abuse of discretion does not result merely because the reviewing court might have reached a different conclusion. ***Id.***; ***see also Samuel Bassett v. Kia Motors America, Inc.***, [], 34 A.3d 1, 51 (Pa.

2011); ***Christianson v. Ely***, [], 838 A.2d 630, 634 (Pa. 2003). Instead, a decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. ***Id.***

> As we discussed in ***R.J.T.***, there are clear reasons for applying an abuse of discretion standard of review in these cases. We observed that, unlike trial courts, appellate courts are not equipped to make the fact-specific determinations on a cold record, where the trial judges are observing the parties during the relevant hearing and often presiding over numerous other hearings regarding the child and parents. ***R.J.T.***, 9 A.3d at 1190. Therefore, even where the facts could support an opposite result, as is often the case in dependency and termination cases, an appellate court must resist the urge to second guess the trial court and impose its own credibility determinations and judgment; instead[,] we must defer to the trial judges so long as the factual findings are supported by the record and the court's legal conclusions are not the result of an error of law or an abuse of discretion. ***In re Adoption of Atencio***, 650 A.2d 1064, 1066 (Pa. 1994).

***In re Adoption of S.P.***, 47 A.3d 817, 826-27 (Pa. 2012).

We will address Father's first three claims together, as he does so in his appellate brief. Father claims that the trial court improperly terminated his parental rights to Child because it did not consider the Agency's lack of assistance "to relieve the impossibility of performance of the barrier [to] reunification[.]" Father's Brief at 5. Father identifies these barriers as the completion of the Abel assessment and the polygraph test. ***Id.*** Father directs our attention to testimony that he had visited consistently with Child and cared for Child prior to the suspension of his visits by the dependency court. ***Id.*** Father asserts that he sent cards and gifts to Child, including while he was in prison. ***Id.*** According to Father, a card from him to Child was returned, for

- 5 -

the first time, on or about the time that the Agency filed its termination Petition. *Id.*

Father contends that he has made diligent efforts toward assuming his parental duties. *Id.* at 6. Father argues that he has satisfied the dependency Order's requirements for drug and alcohol evaluations and random drug screens. *Id.* Further, Father testified that he met with CYS, as required by the dependency Order, until he was incarcerated. *Id.* According to Father, he was prevented from moving into the observation phase with Child because of his inability to complete the Abel assessment and the polygraph test. *Id.*

Father contends that the trial court should have dismissed the termination Petition because it was "impossible" for him to complete the Abel assessment and the polygraph test. *Id.* at 7. According to Father, he paid a total of $800 for the Abel assessment and polygraph test, but a balance remained due. *Id.* Father contends that "it was impossible for [him] to complete the Abel assessment and polygraph, even if the balance was paid[,] because it was impossible to be available in [prison] due to [Department of Corrections] regulations." *Id.* According to Father, the trial court improperly granted termination, where the Agency failed to assist with Father's financial barrier to reunification. *Id.* Father also claims that the evidence is not clear and convincing as to his incapacity and inability to rectify the issues that led to Child's dependency. *Id.*

Father claims that this is a case of first impression. *Id.* at 8. According to Father, "there is no case law in Pennsylvania that provides guidance as to incapacity by impossibility of performance in termination of parental rights[.]" *Id.* Father directs our attention to case law in other jurisdictions regarding the impossibility of performance in termination cases. *Id.*

The burden is upon the petitioner to prove, by clear and convincing evidence, that the asserted grounds for seeking the termination of parental rights are valid. *In re R.N.J.*, 985 A.2d 273, 276 (Pa. Super. 2009). "The standard of clear and convincing evidence is defined as testimony that is so "clear, direct, weighty[,] and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *Id.* (quoting *In re J.L.C.*, 837 A.2d 1247, 1251 (Pa. Super. 2003)).

This Court may affirm the trial court's decision regarding the termination of parental rights with regard to any one subsection of section 2511(a), along with consideration of section 2511(b).[6] *See In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*). We will address sections 2511(a)(1) and (b), which provide as follows:

### § 2511. Grounds for involuntary termination

---

[6] Although Father does not specifically address section 2511(b) in the argument section of his brief, we will nonetheless address it *infra*. *See In re C.L.G.,* 956 A.2d 999, 1010 (Pa. Super. 2008) (addressing section 2511(b) although parent did not challenge the trial court's analysis under that section).

**(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

> (1)  The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

* * *

**(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child.  The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent.  With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(1), (b).

With respect to subsection 2511(a)(1), our Supreme Court has held as

follows:

> Once the evidence establishes a failure to perform parental duties or a settled purpose of relinquishing parental rights, the court must engage in three lines of inquiry: (1) the parent's explanation for his or her conduct; (2) the post-abandonment contact between parent and child; and (3) consideration of the effect of termination of parental rights on the child pursuant to Section 2511(b).

*In re Adoption of Charles E.D.M.*, 708 A.2d 88, 92 (Pa. 1998).  Further,

> the trial court must consider the whole history of a given case and not mechanically apply the six-month statutory provision. The court must examine the individual circumstances of each case and consider all explanations offered by the parent facing termination of his or her parental rights, to determine if the evidence, in light

- 8 -

of the totality of the circumstances, clearly warrants the involuntary termination.

*In re B.,N.M.*, 856 A.2d 847, 855 (Pa. Super. 2004) (citations omitted).

As our Supreme Court has explained,

a parent "has an affirmative duty to love, protect and support his child and to make an effort to maintain communication and association with that child." [*In re: Adoption of McCray*, 331 A.2d 652, 655 (Pa. 1975)]

\* \* \*

Where the parent does not exercise reasonable firmness in declining to yield to obstacles, his other rights may be forfeited.

*Adoption of S.P.*, 47 A.3d at 828 (footnotes and internal quotation marks omitted).

At the termination hearing, the Agency presented the testimony of Scott Bomberger ("Agent Bomberger"), a reentry parole agent at Greene State Correctional Institution. N.T., 12/18/20, at 16. Agent Bomberger testified that, while he was a field sex offender agent, Father was under Agent Bomberger's supervision for approximately two months. *Id.* at 16, 28. Upon his parole, Father was sent to Agent Bomberger's unit because of Father's conviction of corruption of minors, in a sexually related incident. *Id.* at 17-18.

Agent Bomberger testified that, as a condition of parole, Father was required to "get evaluated for sex offender treatment, and if … [Father] was given treatment, and he must complete the treatment." *Id.* at 18. In addition, the standard conditions of parole prohibited Father from having

contact with anyone under the age of 18, "or he's not permitted to have any kind of communication with anybody[,] or live with anybody … who is the guardian of somebody that's under the age of 18." ***Id.***

Agent Bomberger testified that Father was to complete sex offender treatment at FAACT. ***Id.*** at 19. However, Father did not complete his treatment. ***Id***. "He was supposed to be paying on a polygraph for tests, which is part of his treatment, [] which wasn't being done." ***Id.*** Further, Agent Bomberger testified that Father had absconded and, as a result, Father "missed meetings, and so, through that, he was unsuccessfully discharged from the [s]ex [o]ffender [t]reatment [p]rogram." ***Id.*** Agent Bomberger clarified that Father had absconded in October 2019. ***Id.*** As a result, a warrant was issued for Father's arrest. ***Id.*** at 22. Agent Bomberger was unaware that, during this time period, Father was having supervised contact with Child through CYS. ***Id.*** at 33.

Lucille Shea ("Ms. Shea"), a case manager at FAACT, testified regarding Father's therapy. ***Id.*** at 41. Ms. Shea testified that FAACT is "a sex offender specific outpatient treatment provider." ***Id.*** For a "period of time," Father attended 1.5-hour sessions, twice a month, with Ms. Shea. ***Id.*** According to Ms. Shea, Father engaged in these services for one year. ***Id.*** at 47, 49. Ms. Shea testified,

> [Father] was compliant with attendance and participation. At times [he] was superficial, but for the most part, he participated. There were two treatment recommendations we had for [Father]

- 10 -

that he did not complete[,] which were a maintenance monitoring polygraph and an A[bel] assessment.

*Id.* at 42.  Ultimately, Father did not complete the FAACT Program.  *Id.* at 43.

As Ms. Shea explained,

[t]he ultimate goal would be for [Father] to get to a point where he had completed a relapse prevention plan and completing those two assessments.  [Father] and I weren't able to ever get to a point where we started the relapse prevention plan.  There was an outline for it that we used.  We had not gotten to that point again[,] because we were waiting for those assessment results.

*Id.* at 48.  Father was discharged from the program on October 16, 2019, because of his incarceration resulting from his parole violation.  *Id.* at 43.

Orissa Bey ("Ms. Bey"), the CYS caseworker assigned to Child, also testified at the hearing.  Ms. Bey testified that the case was transferred to her in October 2018.  *Id.* at 60.  Ms. Bey testified that Child was adjudicated dependent and has lived at Grandmother's home since September 4, 2018.  *Id.* at 61.  Ms. Bey indicated that it is considered a pre-adoptive home.  *Id.* at 61-62.

Ms. Bey explained that, in the dependency proceedings, Father was ordered to complete drug and alcohol evaluations with an appropriate provider, complete random drug and alcohol testing at the discretion of the Agency, complete sex-offender treatment, complete parenting education through an appropriate provider, follow all recommendations, and meet with the Agency at least once every 30 days.  *Id.* at 62.  According to Ms. Shea, Father completed his drug and alcohol evaluation in 2018.  *Id.*  However,

Father only sporadically complied with random drug and alcohol tests, and has "never been consistent with following through with his recommendation of being drug tested." *Id.* at 62-63. Ms. Bey indicated that the Agency also was concerned about Father's alcohol use. *Id.* at 65.

Ms. Bey testified that in December 2018, as a result of his return to prison, Father was unsuccessfully discharged from the supervised parenting program. *Id.* at 66. Ms. Bey explained the bases for Father's discharge as follows:

> So[,] the information that the Agency obtained was due to [Father's] parole conditioning, due to the FAACT Program, due to not completing the A[bel], and the polygraph test. Due to those requirements not being completed that [Father] was not allowed to be around any minor children under the age of 18, including his own.

*Id.* at 68.

In October 2019, Ms. Bey became aware that Father had absconded from his parole. *Id.* at 71. Although Ms. Bey went to Father's home, she was unable to make contact with him. *Id.* Father had not given Ms. Bey updated contact information, *i.e.*, an address or phone number where he could be reached during this time. *Id.* On December 30, 2019, the Agency was notified of Father's incarceration at Fayette State Correctional Institution. *Id.* Since his incarceration, Ms. Bey has spoken with Father by phone on four occasions. *Id.* at 72. Ms. Bey testified that Father is presently incarcerated on driving under the influence ("DUI") charges. *Id.* Father's last contact with Child was "around December 23rd of 2019, just before Christmas." *Id.* at 73. In March

2020, Father sent Child a birthday card. *Id.* at 73, 90. Father sent Child early Christmas presents in November 2020. *Id.* at 73.

Ms. Bey testified that, prior to Father's return to prison, he was permitted to attend some of Child's medical appointments and was able to contact a placement provider for updates on Child. *Id.* Since his return to prison, Father has provided no financial support for Child, and has not provided for Child's daily care. *Id.* at 74. Rather, Grandmother provides all care for Child. *Id.* Child has been in placement for two years, as of the date of the hearing.[7] *Id.* Ms. Bey confirmed that Father has never successfully completed a parenting program or a sex offender treatment program. *Id.* at 95.

Ms. Bey testified that Child "is very healthy, very active. She attends SmartKids school day care. She is comfortable in the home. She is thriving very well." *Id.* at 74. Child looks to Grandmother for her daily needs and is up to date with her medical needs. *Id.* at 75.

Ms. Bey testified that in the twelve months prior to the filing of the termination Petition, Father has not remedied the circumstances which led to Child's dependency. *Id.* at 77. According to Ms. Bey, Father tested positive for alcohol on May 17, 2019. *Id.* at 86. Further, the trial court made a finding of aggravated circumstances on September 26, 2020, based upon the prior

---

[7] Grandmother additionally cares for half-siblings of Child. N.T., 12/18/20, at 74.

termination of Father's parental rights to another child. *Id.* at 77. Ms. Bey testified that the Agency offered every available service to help Father alleviate the circumstances that necessitated the original placement. *Id.* Of particular note, Ms. Bey testified as follows:

> The last permanency review hearing that was right around March of 2019, or going into 2020, the [trial court] also ordered for us to be able to help assist [Father] to be able to pay for his A[bel] tests and his polygraph test with the expectation of him also sitting down and going over his financial budgeting and, you know, to see what we could help pay for--… help him pay for the payments and everything so that he could take the A[bel] test and the polygraph test. At which time, [Father] did not meet with me on that. He did not take advantage of that. And at which time, it was also explained to me about how much he was in debt and that he had attorney fees and expenses as well.

*Id.* at 78. Although the trial court's July 17, 2019, Order granted Father permission to file a motion for financial assistance to help him pay for the Abel assessment and polygraph test, Father filed no such motion. *Id.*

Father testified at the hearing that, from around August 2018 through September 2018, his paternal aunt, Reverend Sharon Jackson-Quarels, ("Aunt"), supervised his visits with Child. *Id.* at 104. To facilitate the visits, Aunt drove Child from Washington, Pennsylvania, to Aunt's home in Castle Shannon, Pennsylvania. *Id.* at 105. Father would visit Child at Aunt's home weekly, from 8:00 a.m. to 4:00 p.m. *Id.* After the visit, Aunt would return Child to Washington, Pennsylvania. *Id.* After Aunt was involved in an accident, and could no longer provide transportation for Child, Father had supervised visits with Child, twice a week, in his home. *Id.* at 106. However,

when Aunt no longer would supervise the visits, CYS indicated it would explore other options. *Id.* at 108.

CYS proposed that Father visit with Child at Blueprints visitation house ("Blueprints") in Washington, Pennsylvania, and that Blueprints would provide transportation for Child. *Id.* Father, testified that he continued with these visits twice a week, from 9:00 a.m. to 2:00 p.m. *Id.* at 109. Father claimed that he attended all but two of the scheduled visits. *Id.* at 110. Father visited with Child until an April 2019 court hearing. *Id.* at 110-11. Father testified that, upon seeing Father at the hearing, Child reached out for him. *Id.* at 111.

Father testified that in 2019, he attended Child's birthday party, and that he bought her shoes and an outfit for Easter. *Id.* at 112. However, Father's parole officer told Father that he could no longer have contact with Child. *Id.* Father testified regarding a financial arrangement that allowed him to pay one-half of the costs of his required treatment, and save the other one-half to pay for the Abel assessment and polygraph test. *Id.* at 114. Father asserted that he did not understand the trial court's "terminology," when the trial court informed him that he could file a motion for financial assistance for the Abel assessment and the polygraph test. *Id.* Father testified that he has made payments every week for the Abel assessment and the polygraph test. N.T., 12/19/20, at 8-9. *Id.* at 14. However, Father claims that he does not have funds to pay the balance due for the Abel Assessment

and the polygraph test. *Id.* Father stated that he cannot complete those assessments, as they are not provided by the Department of Corrections. *Id.* at 15.

Father testified that he attended the parenting program. N.T., 12/18/20, at 115. Father stated that

> Melanie[,] from Project STAR[,] went over some parenting techniques. She basically sat back and watched me interact with [Child]. And she took notes, and if she seen anything that I needed help with, she would give input or give a different way of doing things like that, which really never went—we never really crossed that path because she said I was good with [Child] and [Child] was responsive….

*Id.* at 116. During the parenting classes, Father testified that he learned

> [d]ifferent positions to hold [Child] during different situations, if she was tired, if she was hungry, feeding. The best way how to teach her how to walk[,] the best way how—when she was sick and she was crying the best way to try to soothe her and get her to feel better.

*Id.* at 117.

Father testified that, upon his release in 2017, he completed a sex offender program and a sex offender "booster." *Id.* at 119. Since his reincarceration in October 2019, Father testified that he has completed an outpatient drug and alcohol program, and became certified for highway "flagging." Father stated that he has maintained a residence for when he is released from prison, and that it is appropriate for Child. *Id.* at 123.

Father testified that he spoke with Ms. Bey in the middle of January 2019, to inform her about his moving to a new residence. N.T., 12/19/20, at

- 16 -

8-9. However, after informing Ms. Bey that he had signed the lease, she did not inspect his new residence. *Id.* at 9. Father stated that Ms. Bey missed one appointment, and, when she did show up, it was without notifying Father. *Id.* According to Father, he was at work and spoke with Ms. Bey by means of a camera at the residence. *Id.* Father also testified that he has employment available upon his release from prison. *Id.* at 10. According to Father, he would see the Parole Board in September 2021. *Id.* at 12. On his own, Father signed up for Narcotics Anonymous and Alcoholics Anonymous ("NA/AA"). *Id.* Father also is enrolled in custodial maintenance training. *Id.* at 13.

Father testified that he was informed that Child loves him and the bond between them is satisfactory. *Id.* at 15-16. Father believes that it would be more harmful to Child to terminate his parental rights. *Id.* at 16. Father further testified as follows:

> I had made mistakes on parole, and I am paying for it now. And I have taken the measure[s] I need to stop the alcohol. I have since August of last year, … I have attended NA/AA meetings while I was home. I did meetings at SPHS [Behavioral Health] McKeesport. I [] did on my own, not court appointed, but on my own, I have completed a highway safety DUI class in McKeesport at the Bonder (phonetic) building. I have … a sponsor for my recovery for alcoholism. I have also taken the steps prior to my incarceration to seek further treatment for [Alcohol and Other Drugs from] AA, and my sponsor took me to meetings in Washington and Allegheny County.

*Id.* at 19-20.

On cross-examination, Father admitted that he signed the conditions for his parole, prior to his release in April 2017. *Id.* at 23. In August 2018, at

the time of Child's adjudication, Father admitted to being aware of the condition of his parole prohibiting contact with children. *Id.* at 24. Nevertheless, Father admitted that he still visited Child. *Id.* Father acknowledged that he did not advise Ms. Bey of the condition of his parole regarding children. *Id.* Father recognized that he did not complete the requirements of the FAACT Program prior to October 2019. *Id.* at 25. Father testified that, even if he had completed the program, he would not have been permitted unsupervised visits with Child. *Id.* at 26. Father conceded that he had completed the sex offender "booster" prior to his release in April 2017. *Id.* at 27. However, Father has not successfully completed anything since April 2017. *Id.* at 27-28.

During cross-examination, Father stated that he was not a caretaker for Child prior to Child's dependency adjudication. *Id.* at 31. Father further acknowledged that he could not provide care for Child for six months following the termination hearing. *Id.* at 31-32.

Finally, Father presented the testimony of Aunt, who had supervised visitation with Child for a period of time in 2019. *Id.* at 47. At the time of her involvement, Child was under a year old. *Id.* at 49. According to Aunt, during visits with Father, Child would smile and recognize Father. *Id.* at 50. On cross-examination, Aunt testified that Father had not told her about the conditions of his parole. *Id.* at 53.

The trial court concluded that the Agency established, by clear and convincing evidence, that termination is warranted pursuant to section 2511(a)(1). Trial Court Opinion, 3/16/21, at 11. The trial court found that,

> [w]hile Father initially started with moderate compliance, beginning in July of 2019, his conduct and compliance declined. Father was discharged for non-compliance from [the] parenting [program], was found to be positive for alcohol, failed to complete sex offender treatment and received new charges for [DUI]. Additionally, Father remains on supervision for the sex[-]related offense of Corruption of Minors and remains prohibited from being around children, including his own children. This restriction cannot be re-evaluated by his parole [a]gent until[] Father completes the requirements of his sex offender treatment.
>
> Although incarcerated during many points of the dependency case, [c]ourt[-]ordered services contemplated actions that Father could take while incarcerated. … Here, testimony established, whether in and/or out of incarceration and despite offerings of assistance, financial and otherwise, Father failed to use and/or request the available resources, failed to restrict obstacles to his completion[,] and allowed for his continued inability and incapacity to provide essential care for [] Child.

Trial Court Opinion, 3/16/21, at 11.

Upon review, the trial court's determination that the Agency satisfied the requirements of section 2511(a)(1) is supported by competent, clear and convincing evidence in the record, and its legal conclusion is sound. Accordingly, we cannot grant Father relief on this claim. *See Adoption of S.P.*, 47 A.3d at 828; *In re Adoption of Charles E.D.M.*, 708 A.2d at 92.

Next, we address the termination of Father's parental rights to Child pursuant to section 2511(b). This Court has stated that the focus in terminating parental rights under section 2511(a) is on the parent, but it is

on the child pursuant to section 2511(b). *See In re Adoption of C.L.G.*, 956 A.2d 999, 1008 (Pa. Super. 2008) (*en banc*). In reviewing the evidence in support of termination under section 2511(b), our Supreme Court has stated the following:

> [I]f the grounds for termination under subsection (a) are met, a court "shall give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S.[A.] § 2511(b). The emotional needs and welfare of the child have been properly interpreted to include "[i]ntangibles such as love, comfort, security, and stability." *In re K.M.*, 53 A.3d 781, 791 (Pa. Super. 2012). In *In re E.M.*, [620 A.2d 481, 485 (Pa. 1993)], this Court held that the determination of the child's "needs and welfare" requires consideration of the emotional bonds between the parent and child. The "utmost attention" should be paid to discerning the effect on the child of permanently severing the parental bond. *In re K.M.*, 53 A.3d at 791.

*In re: T.S.M.*, 71 A.3d 251, 267 (Pa. 2013).

When evaluating a parental bond, "the court is not required to use expert testimony." *In re Z.P.,* 994 A.2d 1108, 1121 (Pa. Super. 2010). "Additionally, section 2511(b) does not require a formal bonding evaluation." *Id.* Further,

> concluding [that] a child has a beneficial bond with a parent simply because the child harbors affection for the parent is not only dangerous, it is logically unsound. If a child's feelings were the dispositive factor in the bonding analysis, the analysis would be reduced to an exercise in semantics as it is the rare child who, after being subject to neglect and abuse, is able to sift through the emotional wreckage and completely disavow a parent.… Nor are we of the opinion that the biological connection between [the parent] and the children is sufficient in of itself, or when considered in connection with a child's feeling toward a parent, to establish a *de facto* beneficial bond exists. The psychological aspect of parenthood is more important in terms of the

- 20 -

development of the child and [his or her] mental and emotional health than the coincidence of biological or natural parenthood.

*In re K.K.R.-S.*, 958 A.2d 529, 535 (Pa. Super. 2008) (internal citations and quotation marks omitted). Thus, the court may emphasize the safety needs of the child. *See In re K.Z.S.*, 946 A.2d at 763 (affirming involuntary termination of parental rights, despite existence of some bond, where placement with father would be contrary to child's best interests). "[A] parent's basic constitutional right to the custody and rearing of his … child is converted, upon the failure to fulfill his … parental duties, to the child's right to have proper parenting and fulfillment of [the child's] potential in a permanent, healthy, safe environment." *In re B.,N.M.*, 856 A.2d at 856 (internal citations omitted).

This Court has explained that a parent's own feelings of love and affection for a child, alone, do not prevent termination of parental rights. *In re Z.P.*, 994 A.2d at 1121. "[W]e will not toll the well-being and permanency of [a child] indefinitely." *In re Adoption of C.L.G.*, 956 A.2d at 1007 (citing *In re Z.S.W.*, 946 A.2d 726, 732 (Pa. Super. 2008) (stating that a child's life "simply cannot be put on hold in the hope that [a parent] will summon the ability to handle the responsibilities of parenting.")).

At the hearing, Ms. Bey testified that Child

is very bonded in her home. She's very comfortable going to [Grandmother] whenever she needs anything. She is also very comfortable going to her siblings, her older siblings. She just fits right in at home. It would be, you know, very devastating to see her leave the home because that's all she knows.

- 21 -

N.T., 12/18/20, at 75. Child has not asked Ms. Bey about Father. *Id.* Ms.

Bey explained that,

> [i]n the beginning, [Father] was … very cooperative. And, you know, for over two years there has just been no type of progress at all. And I think that … it's not fair for a child to wait any longer to continue on thriving in her life for a parent who's been, you know, not there for her for two years….

*Id.* at 80.

> In its Opinion, the trial court found as follows:

> [Child] has been in placement for well over 27 months. The kinship foster family includes [Child's] half-siblings and the home is pre-adoptive. Father has never lived with [] Child, has never provided regular care for [] Child[,] and is unable to identify a time in the near future when he would be able to assume such responsibility. While Father presented a witness to testify to his limited interactions with [] Child, said interactions were fleeting and very early in [] Child's life. Testimony from Father and [Ms. Shea] indicates that Child has not seen Father since 2019, at the latest. In fact, [Ms. Shea] believes [that] Child may not even recognize Father at this time. In essence, there is no evidence of a parental bond between [] Child and Father….

Trial Court Opinion, 3/16/21, at 12-13. As set forth above, the clear and

convincing evidence of record supports the trial court's determination that

termination would be in Child's best interests.

In summary, there is clear and convincing evidence from which the trial

court, considering Child's needs and welfare, could have properly determined

that Father failed to perform his parental duties to Child during the six-month

period preceding the filing of the Petition; Father's explanation for his conduct

was unconvincing; there was no bond between Child and Father because his

own actions placed obstacles to the development of such a bond; and the termination of Father's parental rights was in Child's best interest. We will not disturb the trial court's Order. ***In re Adoption of S.P.***, 47 A.3d at 826-27; ***In re: T.S.M.***, 71 A.3d at 267. Accordingly, we affirm the Order terminating Father's parental rights to Child pursuant to 23 Pa.C.S.A. § 2511(a)(1) and (b).

Order affirmed.

Judge Olson joins the memorandum.

Judge Nichols concurs in the result.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 11/19/2021

- 23 -